## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

AARON G. BAUKNIGHT,

     Plaintiff,

     v.

BOARD OF EDUCATION OF
PRINCE GEORGE'S COUNTY,

     Defendant.

Civil Action No. TDC-20-3471

### MEMORANDUM OPINION

Plaintiff Aaron G. Bauknight, who is self-represented, has filed this civil action against Defendant Prince George's County Public Schools in which he has asserted claims of race discrimination and retaliation in violation of 42 U.S.C. § 1983 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2, 2000e-3 (2018). Defendant has filed a Motion for Summary Judgment, which is now fully briefed. Bauknight has filed a "Motion to Dismiss in Response to Pleading," which, because it effectively seeks judgment in his favor, the Court construes as a Cross Motion for Summary Judgment. Upon review of the submitted materials, the Court finds that no hearing is necessary to resolve the Motion. *See* D. Md. Local R. 105.6. For the reasons set forth below, Defendant's Motion will be GRANTED, and Bauknight's Motion will be DENIED.

### BACKGROUND

#### I.    Employment History

In September 2012, Plaintiff Aaron G. Bauknight started work as a math and technology teacher in the Prince George's County Public Schools ("PGCPS") in Prince George's County, Maryland. Bauknight is an African American man who identifies as a non-denominational

Christian. From 2015 until his termination, Bauknight worked as a Foundations of Technology teacher at DuVal High School ("DuVal") in Lanham, Maryland. In addition to his work as a teacher, Bauknight has also served as a referee of high school and college basketball, as a high school basketball coach, and as a baseball coach at the middle and high school levels. He received financial stipends for his work as a sports official.

In the fall of 2017, Bauknight submitted an application to become the swimming coach at DuVal and separate applications to become the Athletic Director at DuVal or the Athletic Director at Oxon Hill High School ("Oxon Hill"). Bauknight was not selected to interview for any of these positions and was not hired for any of the three openings. A white woman named Malika was hired to become the DuVal swimming coach, and a white man named Troy Langway, who applied a year after Bauknight applied, was eventually hired to become the DuVal Athletic Director.

On October 29, 2017, after he was notified that he had not been selected for any of these positions, Bauknight sent an email to a PGCPS administrator which stated:

> I've now gone from very concerned to hurt. The issues encountered over the past 100 hours is not anything short of what has been occurring over the past 100 years. The etymology of the Greek word Deuteronomy: deuteros "second" + nomos "law," literally meaning second law. Deuteronomy 25:1-3, 4 says, "If there be a controversy between men, and they come unto judgment, that the judges may judge them; then they shall justify the righteous, and condemn the wicked. And it shall be, if the wicked man be worthy to be beaten, that the judge shall cause him to lie down, and to be beaten before his face, according to his fault, by a certain number. Forty stripes he may give him, and not exceed: lest, if he should exceed, and beat him above those with many stripes, then thy brother should seem vile unto thee.["]

Joint Record ("J.R.") 96, ECF No. 57. The email included an additional line: "Do not muzzle the ox that treadeth on the corn." Opp'n at 19, ECF No. 51.

On November 1, 2017, Bauknight was placed on paid administrative leave because the email was deemed to be "concerning behavior" that could be perceived as a threat to others. J.R. 100. As part of his leave, Bauknight was forbidden from going to any PGCPS location or

2

sponsored event, which prevented him from officiating basketball games involving PGCPS teams. Because PGCPS considered the language of the email to be a possible threat, Bauknight was directed to meet with a psychotherapist for an independent medical examination on December 22, 2017, which resulted in a determination that Bauknight was deemed not likely to harm himself or others.

On January 29, 2018, PGCPS conducted a hearing pursuant to *Cleveland Board of Education v Loudermill*, 470 U.S. 532 (1985), to provide due process, including notice and an opportunity to be heard, in advance of a deprivation of public employment. *Id.* at 541–42. The hearing was attended by Bauknight; Jennifer Lucas, the PGCPS Employee and Labor Relations Advisor; Vanessa Bliss, a union representative; and Kathleen Brady, a PGCPS Instructional Director. At the hearing, Lucas told Bauknight that she had received notice of a charge of discrimination that he filed with the United States Equal Employment Opportunity Commission ("EEOC"). Bauknight stated that in sending the October 29, 2017 email, he had intended to request an investigation into whether there was discrimination in the failure to hire him for a coaching position.

On August 24, 2018, while Bauknight's charge of discrimination was pending, Bauknight received a call and an email from Lucas stating that he would be taken off of administrative leave and was directed to return to work on August 27, 2018. PGCPS issued a Letter of Counsel to Bauknight and advised him that he would be permitted to come back to work on August 27, 2018. The same day, August 24, 2018, Bauknight submitted a request for sick leave for August 27, 28, and 29 and stated in the comments section of the PGCPS leave request system: "I am questioning my identity and personal existence. I have contacted psychiatrists. I am not ready to teach children. I have contacted [the Employee Assistance Program]. I am an emotional wreck." J.R. 108.

3

Bauknight later provided a doctor's note to support this leave request. In responding to the August 24, 2018 email, Bauknight requested back pay for his missed coaching and officiating stipends.

Bauknight returned to work at DuVal on August 31, 2018. Upon his return, he met with Principal Pamela Smith and Smith's supervisor, Dr. Charoscar Coleman. At this meeting, Bauknight stated that he had been unfairly denied the opportunity to become the DuVal Athletic Director and compared his treatment to that of a slave. Bauknight stated that it was unfair that his prior *Loudermill* hearing had been attended only by women and himself. He also requested a transfer to another school. When he was asked if his complaints about the sports program impacted his ability to teach, he stated that they did because he would not be told to "just shut up n**** and be quiet and act like nothing happened." J.R. 109. Bauknight again stated that he did not feel mentally competent to be in front of students. When he was shown to his classroom, a student greeted Bauknight by extending his hand, but Bauknight did not acknowledge the student, later explaining that he was following the school policy against touching students.

On September 4, 2018, Bauknight was again placed on administrative leave with pay. On October 22, 2018, a *Loudermill* hearing was held to address his statements at the August 31, 2018 meeting with Principal Smith and Dr. Coleman. The hearing was attended by Bauknight, Lucas, Bliss, and an advisor from the PGCPS Employee and Labor Relations Office. At the hearing, Bauknight stated that he was "not ready to teach children, because of the way [he was] treated by the white people." J.R. 117. As a result, Bauknight was required to complete certain communication and sensitivity trainings in advance of returning to work on November 7, 2018. He was also offered the use of the Employee Assistance Program to help him address personal life issues that may be adversely impacting his work.

4

On November 7, 2018, the day on which Bauknight was to return from the second administrative leave with pay, he was admitted to Howard University Hospital after having headaches, stress, crying, vomiting, and suicidal ideation.  Bauknight checked out of the hospital on November 9, 2018 but did not return to teaching.  From November 8, 2018 to March 1, 2019, Bauknight was placed on a paid personal illness leave.  From March 2, 2019 until June 30, 2019, Bauknight was on personal illness leave without pay.  On June 30, 2019, Bauknight's approved leave ended.

When Bauknight did not report to work for the 2019-2020 school year, the County sent him a letter dated September 10, 2019 stating that the PGCPS Superintendent intended to recommend him for termination "for misconduct in office, willful neglect of duty and/or insubordination" based on the failure to notify PGCPS that he would not be present over three school days.  J.R. 126.  Bauknight attempted to comply with the letter's request to contact his Leave Granting Authority by placing a telephone call to PGCPS's central office on September 19, 2019, but his call was forwarded to Lucas's voicemail and he never received a return call.  On October 7, 2019, PGCPS sent another letter stating that, since Bauknight still had not returned to work, he was required to clarify his employment status as either returning to work, requesting an extension of leave, resigning, or retiring.  On January 8, 2020, PGCPS held a *Loudermill* hearing relating to Bauknight's failure to report, but Bauknight did not appear because the hearing was held on the same day as the graduation ceremony for Bauknight's Master's Degree program.  Subsequently, Bauknight was recommended for termination based on "abandonment of and resignation from your position as a teacher with PGCPS."  J.R. 135.  The separation was effective as of February 5, 2020.

## II.    Charges of Discrimination

At several points, Bauknight filed formal charges of discrimination with state and federal agencies. On January 9, 2018, Bauknight filed a charge with the Maryland Commission on Civil Rights ("MCCR"), the same charge that Lucas referred to at the January 29, 2018 *Loudermill* hearing as an EEOC charge. In that complaint, Bauknight alleged race discrimination based on the failure to hire him for the swimming coach position and the Oxon Hill Athletic Director position, religious discrimination based on his placement on leave after his use of a biblical verse in his October 29, 2017 email, and retaliation. The charge was dismissed without prejudice when the agency was notified that Bauknight filed the present action.

On December 18, 2018, Bauknight filed a charge of discrimination with the EEOC, in which he alleged race and sex discrimination, as well as retaliation, in connection with his second placement on administrative leave in the fall of 2018. Bauknight was issued a Right to Sue Notice on August 19, 2019. On July 14, 2020, Bauknight filed a second charge of discrimination with the EEOC in which he alleged discrimination based on race, color, and sex in relation to his non-selection for the DuVal Athletic Director position, the denial of his request to transfer to another school in August 2019, and his termination on February 5, 2020. Bauknight also asserted a claim of retaliation for engaging in protected activity. A Notice of Right to Sue relating to this EEOC charge was issued on September 3, 2020.

## III.    The Complaint

Bauknight filed his initial Complaint in the present case on November 25, 2020. In the presently operative Amended Complaint, filed on December 20, 2021, Bauknight asserts 10 causes of action. Counts 1, 2, and 3 each allege that Bauknight's placement on administrative leave constituted unlawful retaliation under Title VII. In Count 1, he alleges that the retaliation was

6

based on religion; in Count 2, he alleges that the retaliation was based on sex; and in Count 3 he alleges that the retaliation was based on race. Counts 4 and 7 both assert a claim under 42 U.S.C. § 1983 that his placement on administrative leave and inability to engage in officiating basketball in Prince George's County violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Count 5 alleges a claim for harassment, construed as a Title VII claim for a hostile work environment, based on the requirement that Bauknight meet with a psychotherapist following his first administrative leave. Count 6 asserts a claim of race and sex discrimination under Title VII based on the placement of Bauknight on administrative leave for a second time and the failure to transfer him to another school. Count 8 asserts a claim for harassment or a hostile work environment under Title VII based on Lucas's allegedly unprofessional treatment of him, including her "conduct over the phone, letters written in bold and caps lock, and presence during" the second *Loudermill* meeting. Am. Compl. ¶ 51, ECF No. 30. Count 9 alleges a claim of discriminatory and retaliatory termination in which he asserts that his termination was based on race, sex, and religious discrimination and retaliation for filing EEOC charges. Finally, Count 10 alleges that his termination was based on age discrimination, which the Court construes as a claim under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623 (2018).

## DISCUSSION

In its Motion, Defendant seeks summary judgment under Federal Rule of Civil Procedure 56. In support of the Motion, Defendant argues that (1) the PGCPS is not a legal entity subject to suit; (2) Defendant is not a "person" subject to suit under § 1983; (3) Bauknight has failed to exhaust administrative remedies as to his ADEA claim; and (4) there is insufficient evidence to support his claims in the remaining counts. In his Cross Motion, Bauknight responds to statements

made in Defendant's Answer, identifies various alleged procedural violations, and seeks judgment in his favor. Where, upon review, the Court finds the alleged procedural violations insufficient to provide a basis for judgment in favor of Bauknight, the Court will consider, in conjunction with its review of Defendant's Motion, whether Bauknight is entitled to judgment under a traditional summary judgment analysis.

## I.    Legal Standard

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is "genuine" only if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248–49.

## II.   PGCPS

In its Motion, Defendant states that "Prince George's County Public Schools" is not a legal entity and cannot be sued. Defendant acknowledges, however, that the Board of Education of Prince George's County ("the Board") would be a proper defendant. *See* Md. Code Ann., Educ. § 3-104 (LexisNexis 2022) (providing that county boards of education may sue and be sued); *James v. Frederick Cnty. Pub. Schs.*, 441 F. Supp. 2d 755, 758 (D. Md. 2006) (stating that in Maryland,

8

a school board may sue and be sued and so the properly-named defendant is the county board of education). Accordingly, the Court will dismiss PGCPS as a defendant, substitute in the Board as the proper defendant, and direct the Clerk to correct the docket accordingly.

**III.    42 U.S.C. § 1983**

The Board contends that the § 1983 claims in Counts 4 and 7 must be dismissed because it is a state agency that is not subject to suit under § 1983. Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. Neither a state government nor its officials acting in their official capacities is a "person" within the meaning of § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).   In Maryland, county school boards are considered state agencies rather than independent, local bodies. *See Bd. of Educ. of Balt. Cnty. v. Zimmer-Rubert*, 973 A.2d 233, 236 (Md. 2009). Because the Board is not a "person" subject to suit under § 1983, the Board's Motion will be granted as to Counts 4 and 7. *See* 42 U.S.C. § 1983.

**IV.    Title VII**

Although Bauknight's use in the Complaint of the terms "discrimination" and "retaliation" is not entirely precise, construed liberally, Counts 1-3, 5-6, and 8-9 allege violations of Title VII for discrimination based on race, sex, and religion, for a hostile work environment, and for unlawful retaliation. Although in his brief, Bauknight argues that he was more qualified for the positions he sought than the individuals selected, even construed liberally, Bauknight has not asserted a claim of discriminatory hiring. Rather, the allegedly discriminatory and retaliatory acts

9

asserted in the Complaint are the first placement of Bauknight on administrative leave with pay in November 2017, the second placement on administrative leave with pay in September 2018, and his final termination in February 2020. The Board argues that it is entitled to summary judgment because the record does not contain sufficient evidence to support any of these claims.

## A.    Discrimination

Title VII prohibits an employer from discriminating against an employee on the basis of that employee's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a). To prove employment discrimination under Title VII, there are two methods of proof available. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284–85 (4th Cir. 2004). A plaintiff may present direct or circumstantial evidence that race, religion, sex, or another protected status motivated the employer's action. *Id.* at 284. Alternatively, the plaintiff may proceed using the burden-shifting order of proof first established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). Under *McDonnell Douglas*, a plaintiff must first establish a *prima facie* case of discrimination, which generally consists of four elements: (1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) different treatment from similarly situated employees outside of the protected class. *Giles v. Nat'l R.R. Passenger Corp.*, 59 F.4th 696, 703 (4th Cir. 2023). There are variations in the necessary *prima facie* showing depending upon the nature of the discriminatory action alleged. *McDonnell Douglas*, 411 U.S. at 802 n.13.

If a plaintiff establishes a *prima facie* case of discrimination, a presumption of illegal discrimination arises, and the burden shifts to the employer to produce evidence of a legitimate, non-discriminatory reason for its actions. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011). If the employer articulates such a reason, "the burden shifts back to the plaintiff to

10

demonstrate that the employer's reasons are not true but instead serve as a pretext for discrimination." *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir. 1993). The burden of persuasion lies ultimately with the plaintiff, who bears the burden of proving that the employer intentionally engaged in discrimination. *Id.*; *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 n.2 (4th Cir. 1989).

Bauknight's claims of discrimination arising from his placements on administrative leave and his termination are fairly construed as claims of discriminatory discipline. To establish a *prima facie* case of discriminatory discipline under the *McDonnell Douglas* framework, the plaintiff must show: (1) membership in a protected class; (2) that the plaintiff engaged in prohibited conduct similar to that of a person outside of the protected class; (3) that disciplinary measures imposed on the plaintiff were more severe than those imposed on the other person. *Lightner v. City of Wilmington* 545 F.3d 260, 264–65 (4th Cir. 2008); *Moore v. City of Charlotte*, 754 F.2d 1100, 1105–06 (4th Cir. 1985). In its Motion, the Board contends that Bauknight has not identified a suitable comparator who would satisfy the second and third elements of the *prima facie* case. In the alternative, the Board argues that even if Bauknight's identified comparators were deemed to be valid, it has offered legitimate non-discriminatory reasons for Bauknight's placement on administrative leave and eventual termination.

Bauknight has presented the Court with several proposed comparators to support his claims of discriminatory discipline. Bauknight claims that each of these comparators engaged in conduct similar in severity, if not in kind, to his conduct, and that each was disciplined less harshly than he was. As a threshold matter, because Bauknight has offered only allegations and presented no evidence about these comparators, their infractions, or the discipline to which they were subjected, the Court could grant the Motion based on the lack of evidence about the comparators,

11

which is typically required at the summary judgment stage. *See Bouchat*, 346 F.3d at 522 (stating that "[a] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of [his] pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial"). However, even if the Court could accept Bauknight's allegations as true for purposes of the Motion, Bauknight has not provided sufficient evidence to create a genuine issue of material fact that would allow this case to proceed to trial.

The discipline which Bauknight alleges to have been imposed in a discriminatory fashion consists of his placement on administrative leave after writing an email which PGCPS perceived to be potentially threatening; his second placement on administrative leave when he stated that he did not feel well enough to teach children; and his eventual termination when he did not appear for work and did not respond to requests about his status for five months. As a comparator, Bauknight identifies Troy Sibila, a white male guidance counselor, who was "involved with a grade scandal for inflation of graduation rates" at DuVal from 2014 to 2018. Opp'n at 27. A hyperlink to a news article referenced in Bauknight's brief states that Sibila was fired for this conduct. Lindsay Watts, *EXCLUSIVE: Fired PGCPS Guidance Counselor Believes He Was Made a Scapegoat for Grade-Fixing Scandal*, Fox 5 Washington, D.C. (Mar. 15, 2018), https://www.fox5dc.com/news/exclusive-fired-pgcps-guidance-counselor-believes-he-was-made-a-scapegoat-for-grade-fixing-scandal. Thus, Bauknight was treated more leniently, not more harshly, than Sibila: after the alleged infractions, he was twice placed on administrative leave with pay and on both occasions was invited to return to work. Although he was eventually terminated due to his failure to report to work over a lengthy period of time, where the conduct was entirely different from that of Sibila, the Court finds that Sibila is an unsuitable comparator for purposes of Bauknight's discriminatory discipline claim.

12

Bauknight also identifies Cela Gomez-Showell, a Hispanic woman, as another potential comparator. Gomez-Showell allegedly called the PGCPS Superintendent a "plantation owner" at a school assembly but was not placed on administrative leave. Opp'n at 27. Gomez-Showell's conduct, however, was qualitatively different from that of Bauknight, as she did not make any statements that were perceived as a threat to others, and she did not state that she was unprepared to teach children. There is no allegation that Gomez-Showell failed to report to work for several days at a time without explanation. She therefore is not an appropriate comparator who could provide support for Bauknight's discriminatory discipline claim.

Doney Olivieri, the third identified comparator, was charged with various sex offenses against minors. Bauknight does not identify Olivieri's race or provide facts to demonstrate whether or not he is a member of any of the protected classes at issue in this case. Bauknight likewise does not describe what, if any, final disciplinary action was taken against Olivieri. He therefore has not provided sufficient evidence to support a finding that Olivieri is a suitable comparator for the discriminatory discipline claim. Where Bauknight has not identified any suitable comparators, he has not provided sufficient evidence to support a *prima facie* case of discriminatory discipline.

Finally, to the extent that Bauknight argues that the fact that he was placed on administrative leave after using a biblical verse could be construed as religious discrimination, the Court finds that where the selected verse specifically references the potential use of violence, there is documentation that PGCPS perceived the use of that language as potentially threatening, and there is no other evidence that could arguably be construed as exhibiting religious animus, there is insufficient evidence for a reasonable factfinder to conclude that the first placement on administrative leave constituted religious discrimination.

**B.     Hostile Work Environment**

In Counts 5 and 8, Bauknight asserts claims of harassment which the Court construes as claims of a hostile work environment under Title VII.  A hostile work environment exists "when the workplace is permeated with discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993).  To prevail on a Title VII hostile work environment claim, a plaintiff must establish that (1) the plaintiff was subjected to unwelcome conduct; (2) the conduct was based on the plaintiff's protected class; (3) the conduct was sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment; and (4) there is some basis for imputing liability to the employer. *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 331 (4th Cir. 2003); *Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 266 (4th Cir. 2001).

Here, Bauknight has failed to produce evidence demonstrating a genuine issue of material fact as to the second and third elements.  The allegedly harassing conduct includes (1) the placement of Bauknight on administrative leave with pay on two occasions; (2) the prohibition on entering school facilities or attending school-sponsored events, which impacted Bauknight's ability to engage in sports officiating; (3) the requirement that Bauknight undergo a mental health evaluation in 2017; and (4) arguably offensive conduct by Lucas, who allegedly berated Bauknight during *Loudermill* hearings, used an offensive tone of voice and hand gestures, and used bold font and all capital letters in email correspondence.

Whether a work environment is hostile or abusive is evaluated using both subjective and objective components.  "The environment must be perceived by the victim as hostile or abusive." *Ziskie v. Mineta*, 547 F.3d 220, 227 (4th Cir. 2008).  The objective component is "judged from the

14

perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). Factors to consider include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

Here, the identified conduct includes standard personnel actions, such as placing someone on administrative leave, that lack the element of "intimidation, ridicule, and insult" that characterizes a hostile work environment. *Harris*, 510 U.S. at 21. Using bold font and all capital letters, and using certain hand gestures and tone of voice, may be subjectively offensive, but it is not so severe as to meet the objective standard for an abusive work environment. *See. e.g.*, *Holloway v. Maryland*, 32 F.4th 293, 301 (4th Cir. 2022) (holding that allegations that a supervisor criticized the plaintiff's leadership and budget management in meetings, scheduled a meeting to start before the plaintiff was scheduled to arrive and then yelled and slammed documents onto a desk during the meeting, required him to sign a disciplinary evaluation, required him to address the supervisor as "sir," failed to honor him at an employee recognition event, and surveyed other employees about the plaintiff's whereabouts during the work day were insufficient "to establish an abusive environment"); *Buchhagen v. ICF Int'l, Inc.*, 545 F. App'x 217, 219 (4th Cir. 2013) (finding that allegations of a supervisor mockingly yelling at the plaintiff in a meeting, "yelling and pounding her hands on her desk during another meeting," "repeatedly harp[ing] on a mistake" by the plaintiff, making "snide comments" to the plaintiff, "playing favorites with employees and pitting employees against each other," and "unfairly scrutinizing and criticizing" the plaintiff's use of leave and lack of compliance with directives fall "far short of being severe or pervasive enough to establish an abusive environment"). The Court finds that a reasonable factfinder could not find

15

that the identified conduct was "so out of the ordinary as to meet the severe or pervasive criterion." *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 316 (4th Cir. 2008).

Further, there is nothing in the record to support the conclusion that the placements on administrative leave, the referral to the mental health professional, or the actions of Lucas were motivated by discriminatory animus relating to race, sex, or religion. There is no evidence of the use of derogatory language based on any of these factors, and Bauknight has identified no comparators outside of these protected classes who have been treated more favorably under similar circumstances.

For these reasons, the Board's Motion will be granted as to the Title VII hostile work environment claims in Counts 5 and 8.

## C.    Retaliation

Bauknight's Title VII claims also allege unlawful retaliation consisting of his first and second placements on administrative leave and his termination. To state a Title VII retaliation claim, a plaintiff must establish a *prima facie* case that "(1) the plaintiff engaged in a protected activity, such as filing a complaint with the EEOC; (2) the employer acted adversely against the plaintiff; and (3) the protected activity was causally connected to the employer's adverse action." *Okoli v. City of Balt.*, 648 F.3d 216, 223 (4th Cir. 2011) (quoting *Beall v. Abbott Labs.*, 130 F.3d 614, 619 (4th Cir. 1997)). If a *prima facie* case is established, the burden shifts to the employer to show that the adverse action was taken for a legitimate non-retaliatory reason. *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 122 (4th Cir. 2021). If the employer makes this showing, the burden shifts to the plaintiff once again to demonstrate that the employer's purported non-retaliatory reason was a pretext for retaliation. *Id.*

16

### 1. *Prima Facie* Case

Bauknight first asserts that his October 29, 2017 email constituted a protected activity because it contained a complaint of discrimination. Although the reference to the biblical verse is not fairly construed as a discrimination complaint, Bauknight stated later in the email, in questioning the selection of a white person as the swimming coach, "is it that Prince George's County desire to keep its white counterparts in high positions to dehumanize blacks" or to "keep blacks such as myself out of higher positions to widen the achievement gap?" 10/29/17 Email at 1, Compl. Ex. B, ECF No. 1-5. Protected activity is not limited to the filing of formal discrimination complaints with government agencies but instead may include informal oral or written complaints of discrimination to the employer. *Strothers v. City of Laurel*, 895 F.3d 317, 328 (4th Cir. 2018). Viewing the evidence in the light most favorable to Bauknight, the Court construes the October 29, 2017 email as including a complaint of discrimination. For purposes of a retaliation claim, a materially adverse action is one which "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Although the placement on administrative leave was with pay, particularly where it came with a restriction on entering a school or attending a school-sponsored event, and Bauknight has asserted that it thus prevented him from working as a sports official, the Court finds that the first placement on administrative leave constituted a materially adverse action. Where this action occurred on November 1, 2017, only three days after the October 29, 2017 email was sent, the temporal proximity is sufficient satisfy the causation requirement for purposes of a *prima facie* case. *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (stating that "very close" temporal proximity between the protected activity and the materially adverse action establishes a *prima facie* case of retaliation).

17

As to the second placement on administrative leave, Bauknight filed a charge of discrimination with the MCCR on January 9, 2018, nine months before the placement in September 2018. The time between this protected activity and the materially adverse action was arguably too long to satisfy the causation element. *See id.* Nevertheless, Bauknight also asserts that he orally complained about discrimination during his meeting with Principal Smith and Dr. Coleman on August 31, 2018, only five days before the second placement on administrative leave. This temporal proximity between Bauknight's complaint of discrimination and the materially adverse action is sufficient to establish a causal connection at the *prima facie* stage. *See id.*

As for the termination, the most recent, identifiable protected activity was the EEOC charge of discrimination filed on December 18, 2018, approximately 16 months before his termination in February 2020. In this instance, the temporal proximity is not sufficient on its own to meet the causation requirement, particularly where Bauknight has not provided any other direct or circumstantial evidence of causation and has not shown how there were no earlier opportunities for retaliation following these protected activities. *See id.* at 273–74 (finding that temporal proximity must be "very close" and that a 20-month period between protected activity and materially adverse action "suggests, by itself, no causality at all"); *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003) (stating that where any employment decision occurs only at a "natural decision point," temporal proximity need not be very close to give rise to an inference of causation). The Court therefore finds that Bauknight has not established a *prima facie* case of retaliation as to the termination decision.

### 2.    Legitimate, Non-Retaliatory Reason

As to the two retaliation claims for which Bauknight has arguably demonstrated a *prima facie* case, the claims relating to the two placements on administrative leave, the Board has met its

18

burden of demonstrating legitimate, non-retaliatory reasons for the materially adverse actions. On the first placement, the Board has produced evidence that Bauknight was placed on administrative leave because the October 29, 2017 email was construed as containing a threat. The language of the email itself, which states in part "if the wicked man be worthy to be beaten, that the judges shall cause him to lie down, and to be beaten before his face," J.R. 96, supports this conclusion. Moreover, PGCPS asserted this reason shortly after receiving the email, when it stated in the Letter of Counsel sent on September 10, 2017, "you made several concerning statements in an email dated October 29, 2017, that could be perceived as a threat to the safety and security of Prince George's County Public Schools (PGCPS) students and staff." *Id.* The Letter of Counsel further stated that "[i]n light of increased school violence on a national level, discussions not directly related to instruction that appears threatening, may be misconstrued and reported as a real threat to the safety and security of PGCPS students and staff." *Id.* The Board has thus met its burden of producing sufficient evidence of a legitimate non-retaliatory reason for the first placement on administrative leave: that he was believed to have made a written threat of violence.

As for the second placement on administrative leave, Defendant has presented evidence that this action was taken because his statements were seen as "concerning and/or disparaging," in contravention of the PGCPS Employee Code of Conduct which states that "employees must practice civility in all interactions, seek and respect the opinions of others." J.R. 117. Moreover, Bauknight stated on several occasions that he was not mentally ready to teach, including in a leave request on August 24, 2018, during the August 31, 2018 meeting with Principal Smith and Dr. Coleman, and during the *Loudermill* hearing on October 22, 2018 to discuss the second placement on administrative leave. These statements included that he was "not ready to teach children" and was an "emotional wreck," J.R. 108, he was not mentally competent to be in front of children, and

19

he was "not ready to teach children" because of the way he was treated by white people, J.R. 117. The fact that Bauknight was not prepared to teach is corroborated in part by the fact that he checked himself into a hospital on November 7, 2018 with stress-related symptoms.  Where there is significant evidence that Bauknight was not in a mental state that would permit him to teach in a classroom, the Court finds that the Board has provided evidence of a legitimate, non-retaliatory reason for the second administrative leave.

### 3.    Pretext

In the face of legitimate, non-retaliatory reasons for the placements on administrative leave, Bauknight has produced no evidence to demonstrate that these reasons were a pretext for retaliation and were "unworthy of credence." *Tex. Dept. of Cmty. Aff. v. Burdine*, 450 U.S. 248, 256 (1981). As to the first placement on administrative leave, Bauknight has not shown that any of the PGCPS officials involved in that decision were motivated by anything other than a concern about the potentially threatening nature of his email referencing violence.  He also has not provided a basis to refute the evidence that the second administrative leave was motivated by concerns about his readiness to teach.  Where there is no rebuttal of the reasons for "actions which, if believed by the trier of fact, would support a finding that unlawful [retaliation] was not the cause of the employment action," *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993), there is no genuine issue of material fact on the retaliation claims.  The Board's Motion will be granted as to Counts 1-3, 6, 8, and 9.

## V.    ADEA

Finally, construed liberally, Count 10 asserts a claim of age discrimination under the ADEA.  The ADEA protects workers who are 40 years of age or older from employment discrimination based on age.  29 U.S.C. §§ 623(a), 631(a); *Westmoreland v. TWC Admin. LLC*,

20

924 F.3d 718, 725 (4th Cir. 2019).  Although Defendant primarily argues that this claim fails because Bauknight failed to exhaust administrative remedies, the Court need not address that issue because Bauknight stated in his deposition that his date of birth is July 10, 1980.  J.R. 4.  Therefore, Bauknight was only 37 years old at the time he was first placed on administrative leave in November 2017, 38 years old at the time of his second placement on administrative leave in September 2018; and 39 years old at the time he was terminated in February 2020.  Thus, Bauknight's age discrimination claim, even if properly considered on the merits, necessarily fails because Bauknight has not shown that he is a member of the class of individuals protected by the ADEA.  The Board's Motion will be granted as to Count 10.

## CONCLUSION

For the foregoing reasons, the Board's Motion for Summary Judgment will be GRANTED, and Bauknight's Motion to Dismiss in Response to Pleading, construed as a Cross Motion for Summary Judgment, will be DENIED.  A separate Order shall issue.

Date:   September 12, 2023

THEODORE D. CHUANG
United States District Judge

21